UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRYCE MORAN,

       Plaintiff,

v.

KALITTA AIR, L.L.C.,
A Michigan Limited Liability Company,

       Defendant.

Case No: 2:11-cv-14696-SJM-RSW

Hon. Stephen J. Murphy, III

# DEFENDANT KALITTA AIR'S
# REPLY TO MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

|   |   | Page No. |
|---|---|---|
| TABLE OF CONTENTS | | i |
| I. | PLAINTIFF IS NOT A QUALIFIED INDIVIDUAL WITH A DISABILITY | 1 |
| II. | PLAINTIFF WAS NOT QUALIFIED TO PERFORM THE ESSENTIAL FUNCTIONS OF THE JOB OF FME | 1 |
| III. | DEFENDANT DID NOT KNOW OR HAVE REASON TO KNOW OF THE ALLEGED DISABILITY | 2 |
| IV. | PLAINTIFF DID NOT SUFFER AN ADVERSE EMPLOYMENT ACTION AGAINST HIM BECAUSE OF HIS ALLEGED DISABILITY | 4 |
| V. | SIMILARLY SITUATED EMPLOYEES WERE NOT TREATED MORE FAVORABLY THAN PLAINTIFF | 5 |
| VI. | PLAINTIFF CANNOT ESTABLISH THAT HE WAS REGARDED BY DEFENDANT AS HAVING A DISABILITY UNDER THE ADA | 8 |
| VII. | PLAINTIFF'S ADA CLAIM FAILS BECAUSE PLAINTIFF POSED A DIRECT THREAT TO THE HEALTH OR SAFETY OF HIMSELF AND OTHERS | 10 |
| CONCLUSION | | 12 |

## REPLY TO PLAINTIFF'S COUNTER STATEMENT OF FACTS

### I.     PLAINTIFF IS NOT A QUALIFIED INDIVIDUAL WITH A DISABILITY

As explained in Defendant's Motion (Section II), although Plaintiff claims to have been diagnosed with mixed organic brain syndrome, he failed to prove that he has this mental condition. Plaintiff puts forth only his own lay testimony to prove this complex mental diagnosis; however, his current treating doctor from 2005 to present, Dr. Maria Parris, testified that she did not know that he had MOBS. (*See* **Exhibit X to Defendant's Motion ECF #18, Excerpt from Deposition Transcript of Dr. Maria Parris, pp. 1, 7:16-8:1, 10:17-11:13**). Additionally, Defendant's Expert Witness, Dr. C.H. Dudley, M.D., examined Plaintiff, his medical records, and testimony of Plaintiff's current treating doctors, and determined that there is no evidence that Plaintiff has mixed organic brain syndrome or any psychiatric disorder. (*See* **Exhibit FF, <u>attached</u>, Expert Report of Dr. C.H. Dudley, incl. highlighted pp. 11-13.**) Plaintiff has provided no expert witness testimony or any other evidence and thus has not proven that he has a disability under the ADA.

### II.    PLAINTIFF WAS NOT QUALIFIED TO PERFORM THE ESSENTIAL FUNCTIONS OF THE JOB OF FME

Plaintiff claims a disability of Mixed Organic Brain Syndrome, which can include symptoms of confusion, depression, mental illness, fatigue and dementia. (*See* **Exhibit X to ECF #18, Transcript of Dr. Maria Parris, pp. 10:2-11:25**). Plaintiff admitted that he has had trouble with memory problems, difficulty understanding language, confusion, anxiety, and that he takes and has taken many, many medications, which also have serious side effects such as tremors, confusion, memory loss, mood swings, and depression. (*See* **Exhibit H to ECF #18, Transcript of Plaintiff, pp. 50:4-53:21, 78:13-80:20.**) Plaintiff also admitted that he has changed his medications and dosages himself. (*Id.* at pp. 71:5-71:17.)

1

Regardless of Plaintiff's performance while working at Kalitta Air, other evidence shows that Plaintiff could not perform the essential job functions of an FME. Plaintiff worked for Northwest Airlines for 20 years and was a certified A&P Mechanic; however, Plaintiff had <u>never</u> been a Flight Maintenance Engineer before. Norbert Garland explained that it is not uncommon for a qualified, competent A&P mechanic to fail to perform the FME job satisfactorily due to the stress and additional complications of the FME position, and this is clearly what happened with Plaintiff. (*See* **CORRECTED Exhibit F, <u>attached</u>, Transcript of Norbert Garland, pp. 109:11-112:2.**) Plaintiff's prior work involved much calmer environments and being stationed at one location for a length of time. On the other hand, an FME's job is always time-sensitive to keep the aircraft able to fly when he is with the aircraft on the road all over the world, such as Kingdom of Bahrain; Fujairah, United Arab Emirates; other locations in the Middle East; Ramstein, Germany; Liege, Belgium, Amsterdam, Netherlands; Hong Kong and other locations in China; and Russia, to name a few.

It is not hard to imagine how much more stressful working in the Middle East would be, compared to Plaintiff's earlier work at locations in the United States. And even when Plaintiff's earlier work was outside the United States, he was supervising heavy repairs which can take weeks or longer, not immediate repairs that he personally as an FME had to perform in a matter of hours. Plaintiff's admitted trouble with memory problems, difficulty understanding language, confusion, anxiety, due to mixed organic brain syndrome, would prevent him from performing the essential job functions of a Flight Maintenance Engineer.

### III. DEFENDANT DID NOT KNOW OR HAVE REASON TO KNOW OF THE ALLEGED DISABILITY

Every Kalitta Air witness has testified that they had no idea Plaintiff was disabled or had MOBS or any mental illness/condition. Todd Sharp, Manager of Maintenance Control, testified

2

that Plaintiff never told him he was disabled. Todd Sharp had very sparse contact with Plaintiff. Norbert Garland, Plaintiff's direct supervisor who had much more direct, frequent contact with Plaintiff than anyone else at Kalitta Air, testified that he was unaware of any disability. **(*See* Exhibit Z to ECF #18, Transcript of Todd Sharp, pp. 16:18-16:25; CORRECTED Exhibit F, <u>attached</u>, Transcript of Norbert Garland, pp. 19:1-20:1.)** Corina Sieloff, Human Resources Specialist, testified that she particularly recalls that Plaintiff told her that he did not like telling people he was disabled and that he was reluctant to complete any form indicating he was disabled. **(*See* Exhibit AA to ECF #18, Transcript of Corina Sieloff, pp. 10:6-12:24, 17:11-18:24.)** Thus, it is extremely unlikely that Plaintiff disclosed to anyone at Kalitta Air that he has an alleged mental disability.

Plaintiff claims he told Norbert Garland of his disability, but further questioning revealed that he did not tell Norbert Garland that he had a disability at all:

```
            139
24  Q.  What did you tell Norby?
25  A.  When we were doing the walk around as far as up in the
            140
 1      cockpit.
 2  Q.  When?
 3  A.  He put me on an airplane within seven days of arriving
 4      at station. And as far as, when we were doing the
 5      walk around, inspecting the outside of the aircraft,
 6      my background is structures. It's not systems.
 7          So when we got to the cockpit, I told him
 8      this is my weak point, and I said, you know, this is
 9      where I can't remember things and, you know, the brain
10      damage and everything else.

***
            142
 6  Q.  You told Norby that, though, before they assigned you
 7      an airplane, or did you just say "I'm a disabled vet"
 8      to Norby?
 9  A.  I told him this is my weak spot. This is where I have
10      problems remembering, you know, everything.
11  Q.  But you didn't tell him you had mixed organic brain
12      disease syndrome; correct?
13  A.  No.
```

3

(*See* **Exhibit H to ECF #18, Transcript of Plaintiff, pp. 139:24-140:22, explained by 142:6-142:13).** Plaintiff's testimony contradicts itself numerous times, in just this area of testimony, where it is clear that he never told Norbert Garland anything except that he is confident working on "structures" but less experienced with "systems," (which are two different areas of the aircraft). In fact, it appears clear that Plaintiff believes he has told many employers and coworkers that he is disabled, when he has either told them nothing or simply mentioned that he is a "disabled veteran," which does nothing to indicate what his alleged disability might be or how it might affect his job. Kalitta Air would have no way to know that Plaintiff was allegedly disabled with a non-visible mental disability unless he explained his disability or requested an accommodation, which he never did.

## IV.   PLAINTIFF DID NOT SUFFER AN ADVERSE EMPLOYMENT ACTION AGAINST HIM BECAUSE OF HIS ALLEGED DISABILITY

Norbert Garland, Defendant's FME Supervisor, was responsible for supervising and managing all of the FME's, including Plaintiff. Mr. Garland testified that he met with Plaintiff on his return from his final 20-day assignment, and he told Plaintiff that he was suspended pending an investigation. Mr. Garland testified that he told Plaintiff that his mistakes were <u>probably</u> serious enough to warrant a termination, and he told Plaintiff that he had the option to resign. Despite Plaintiff's mischaracterization of Mr. Garland's testimony, at no time did Mr. Garland tell Plaintiff that he was fired or would be fired. (*See* **CORRECTED Exhibit F, <u>attached</u>, Transcript of Norbert Garland, pp. 1, 73:12-75:5).** Norbert Garland testified:

```
              74
14  A.  I do know I told him he was going to be
15      suspended pending the outcome of what we
16      found, you know. I hadn't talked to
17      Grenovich. I had nothing in writing on
18      anything on him so.
19  Q.  Did you ever get anything in writing from
```

4

```
20      Grenovich?
21  A.  No.
22  Q.  All right.
23  A.  I told him the procedures I would be going
24      through, but I felt that the violations were
25      serious enough at that time to warrant a
                    75
1       termination.
2   Q.  Okay.
3   A.  And I gave him the option at that point.
4   Q.  Of resigning?
5   A.  Of resigning.
```

Plaintiff provided his resignation the next day.

## V. SIMILARLY SITUATED EMPLOYEES WERE NOT TREATED MORE FAVORABLY THAN PLAINTIFF

Plaintiff was not treated any differently from any other FME. Defendant produced over 2,500 pages of personnel files for 53 FME's. There has been no testimony regarding these personnel files or any discipline or lack thereof. Also, Plaintiff provided only a page or two out of some of the files, which do not provide context for Plaintiff's allegations of disparate treatment. Further, there is no evidence regarding whether any of these other FME's are disabled or not, as Kalitta Air does not keep track of employee disability. Despite Plaintiff's characterizations here, the evidence shows that Norbert Garland spoke with Plaintiff regarding suspension, at which time Plaintiff resigned, based on the report of Plaintiff dangerously and improperly repairing an operating jet engine while standing in the jet blast area. Although there was testimony during discovery regarding Plaintiff's mistakes on aircraft log pages, these were not the basis for his suspension and eventual resignation; improper REPAIRS to aircraft, dangerous actions, and disregard of safety procedures in Boeing Maintenance Manuals were the basis for his suspension. (*See* **CORRECTED Exhibit F**, <u>attached</u>, Transcript of Norbert Garland, pp. 73:12-77:24. *See also* Exhibit 7 to ECF #22, Norbert Garland Statement and

5

**log pages showing incorrect repairs to aircraft.)** Thus, mistakes of other FME's for issues which are not at all similar or of comparable safety magnitude to Plaintiff's errors are completely irrelevant in this action:

- Frank Becker – 2003 Warning for incorrect maintenance paperwork (Bates D 001263): missing tag and information on log page, *Paperwork, NOT incorrect maintenance work.*

- Gus Esquivel – 2007 Warning for mishandling engine blades, damage (Bates D 1740): damaged company property and warned; *however, Plaintiff conveniently omits <u>3 letters of commendation</u> also in Esquivel's file, which obviously could offset his one warning. Plaintiff had no such positive compliments. Also, this was damage, but not a direct safety concern.* **(See Exhibit GG, <u>attached</u>, Bates D 001719, 1754, 1756-57.)**

- Tasnim Hassan – 2003 Warning for incorrect maintenance paperwork (Bates D 002263): missing tag for part, *Paperwork, NOT incorrect maintenance work.*

- Franz Lanning – 2007 Warning for not alerting supervisor to blown-over stairs on engine run-up (Bates D 002553): *Payroll documents in 2007 (omitted by Plaintiff) show that Lanning was a Senior Mechanic in Oscoda at this time; this is different from FME who travels with aircraft, different department, different work environment could lead to differing levels of discipline.* **(See Exhibit HH, <u>attached</u>, Bates D 002552-54.)**

- Dwight Palmer – 2011 Warning for various issues (Bates D 02937): without testimony or further information, this document is unhelpfully vague as to "numerous maintenance issues." *Not clear if anything regarding Palmer would rise to the level of Plaintiff's replacing the wrong parts, leaving oxygen bottles unsecured, or standing in front of a running engine.*

- Jeff Thomas and James Wright – not mentioned by Plaintiff in Opposition Brief but included in Plaintiff's Exhibit (Bates D 003301, 3556): *these appear to be related to not providing*

6

*leadership or not following leadership instructions; unclear that any incorrect maintenance work was involved, and these appear to be attitude/organizational/interpersonal issues.*

- Benjamin Granquist – Received a few 2 ratings in 2007, 2007 failure to report to work, 2004 left tooling out of place, causing damage to aircraft during operational check (Bates D 002015-16, 2014, 2025): *Norbert Garland testified that he would not keep an FME with a 2 rating, but Garland was not the FME Supervisor on this 2007 evaluation for Granquist; the overall rating was Satisfactory "3," and Garland never testified that Plaintiff's performance review had anything to do with his suspension. Also, failure to report to work is not incorrect maintenance work. Finally, the 2004 tooling left out of place caused damage, and Granquist was <u>Suspended</u>, which was the punishment to Plaintiff before he decided to resign.*

- Anatoli Gramov – Received a few 2 ratings in 2011 (Bates D 002045-46), 2 warnings in 2011 for poor attitude and carelessness (Bates D 002050, 51, 53): *Gromov's entire personnel file shows that he consistently received ratings of 3's, 4's and 5's over the years, including on the 2011 review that received a couple of 2's; the overall rating was Satisfactory "3," and again, Norbert Garland never testified that Plaintiff's performance review had anything to do with his suspension. (See* **Exhibit II, <u>attached</u>, Bates D 002040-42, 45-47, 60-61, 71-73.)** *Also, review of the warnings show attitude and organizational problems causing delays, not incorrect maintenance procedures with direct safety concerns.*

- Randy Walsh – Received a few 2 ratings in 2007 (Bates D 003527-28), 2 warnings in 2009 for poor attitude and carelessness (Bates D 003519, 24): *Walsh's entire personnel file shows that he consistently received ratings of 3's, 4's and 5's over the years, including on his initial 2007 review that received one "2" and needs improvement due to attitude/dependability issues;* and *again, Norbert Garland never testified that Plaintiff's performance review had anything to do*

*with his suspension. (See* **Exhibit JJ,** <u>**attached**</u>**, Bates D 003514-17, 21-22, 27-28.)** *Also, review of the warnings show attitude and interpersonal problems causing delays being the main issue, and Walsh was* <u>*Suspended*</u>*, which was the punishment to Plaintiff before he decided to resign. Finally, Plaintiff conveniently omits* <u>*a letter of commendation*</u> *also in Walsh's file, which obviously could offset his warning. (Id.) Plaintiff had no such positive compliment.*

It is obvious that each FME's work is reviewed not in a vacuum, but in context of their entire body of work and in relation to the precise details of each event. The situations with the above personnel are not comparable to Plaintiff standing in a running engine's jet stream, and several of the FME's were suspended, which is exactly what Norbert Garland told Plaintiff. Moreover, Plaintiff omits to mention Reggie Russell, another FME identified by Kalitta Air in its First Supplemental Response to Plaintiff's Second Set of Interrogatories and Request for Production of Documents. Reggie Russell was hired April 28, 2011, and was Fired September 17, 2012. His personnel file was produced to Plaintiff, along with the other 52 FME's. Nothing in his file indicates any warnings or suspensions or other problems. However, he failed to lock thrust reverser when performing maintenance and was promptly terminated for this safety issue. *(See* **Exhibit KK,** <u>**attached**</u>**, Bates D 003183.)** Reggie Russell also is not disabled, and he was terminated (no suspension or warning) for a single but serious safety violation. His circumstances are much more similar to Plaintiff's than the other FME's discussed above. Plaintiff was not treated any differently than other FME's in this safety sensitive position at airline defendant Kalitta Air.

## VI. <u>PLAINTIFF CANNOT ESTABLISH THAT HE WAS REGARDED BY DEFENDANT AS HAVING A DISABILITY UNDER THE ADA</u>

Plaintiff claims that Kalitta Air "regarded" him as disabled under the ADA, although Plaintiff fails to identify facts to support such an assertion. As explained in Kalitta Air's Motion,

Greg Schroeder testified that he sent <u>one</u> email calling Plaintiff a "moron" because he was performing the FME job insufficiently. **(See Exhibit K to ECF #18, Transcript of Greg Schroeder, pp. 6:13-7:25; 13:1-26:20.)** Greg Schroeder was in another department, with no supervisory authority over Plaintiff whatsoever. Furthermore, there is no evidence that anyone at Kalitta Air ever referred to Plaintiff in a derogatory manner or denigrated his mental state, other than this one time. Plaintiff's Opposition rather cavalierly dismisses Kalitta Air's Director of Maintenance's complaint regarding Plaintiff's inadequate work, misrepresenting that Kalitta Air's complaint was that Plaintiff's log page was "too messy." Of course, that was not the testimony at all regarding this issue. The evidence clearly shows that Kalitta Air's Director of Maintenance Eric Couvreur and Greg Schroeder were discussing Plaintiff's failure <u>again</u> to perform the <u>basic</u> maintenance duties of a Flight Maintenance Engineer and to follow proper procedure, which would have led Plaintiff to consult the Fault Isolation Manual which would have provided, by code, the proper diagnosis the first time. **(See *Id.* and also Exhibit J to ECF #18, Aircraft Maintenance Log Page, Bates D 000633.)** Finally, Plaintiff <u>admitted</u> that his diagnosis of the aircraft's mechanical issue, which was criticized in the email by Greg Schroeder, was incorrect and had to be lined-out and corrected. **(See Exhibit 1 to ECF #22, Transcript of Plaintiff, pp. 113:20-117:3.)**

Unbelievably, Plaintiff now also relies on one aircraft log page which may or may not list Plaintiff as "Moron" rather than "Moran." **(See Exhibit 6 to ECF #22, Bates D000686.)** First, the assertion that anyone purposely listed the crew on this form to include Alvarez, Henderson, Buchanan, Lejuez, Lodouceur, and "Moron" is ridiculous and completely unsupported by any evidence. In fact, both "Lodouceur" and "Moron" are a bit messy and could be "Lodauceur" and "Moran." Second, there is no evidence at this point regarding who completes the top section of

this aircraft log page, since the FME himself completes at least the bottom portion of the page (see, e.g., Plaintiff's signatures on this Exhibit 6 log page). This one log page simply is not evidence of anything, except perhaps the sloppy handwriting that characterizes many log pages.

## VII. PLAINTIFF'S ADA CLAIM FAILS BECAUSE PLAINTIFF POSED A DIRECT THREAT TO THE HEALTH OR SAFETY OF HIMSELF AND OTHERS

Plaintiff claims that Kalitta Air's safety concerns regarding report of Plaintiff standing in the jet stream of a running engine was just a pretext for getting rid of Plaintiff because of a disability that no one knew about. To make this pretext argument, Plaintiff ignores facts, misrepresents testimony, and begins with the incorrect assumption that Norbert Garland's "Statement" regarding Plaintiff's work contains the basis for Plaintiff's dismissal. However, Norbert Garland never testified that his Statement contained the reasons why he suspended Plaintiff, and that is not what the Statement says. Nowhere in the Statement does it say that "these are the reasons I suspended Moran." In fact, it begins by explaining that it is in reference to Moran "and the circumstances leading up to his resignation," and further goes on to explain:

> "This past aircraft 703 had some minor issues that are dealt with everyday of the week by most FME but were occurring during consecutive flight legs. **It was at this point that I started to see his inability to handle stress or his inability to prioritize the task at hand.** I have attached 4 log pages that show the stress level and difficulty he was having from Feb 27 thru Mar 4 which led to major delays **and my concern for his own safety after being advised by crew members of his attempts to install pylon panels with the engine running which could have led to serious injury/death and aircraft damage.** When he arrived Mar 4 I advised him that I would be taking disciplinary action up to and including termination depending on the final report. He then told me he knew he was in trouble and would rather resign than be terminated."

**(*See* Exhibit 7 to ECF #22, emphasis added.)**

Furthermore, Norbert Garland's testimony explains why he talked to Plaintiff about suspension: safety concerns; and he further explains that his Statement memo was to written <u>after</u> Plaintiff resigned, to show Plaintiff's uncertainties/problems, but that Garland did not base the

suspension on the items listed in the memo, except his safety concerns. (*See* **Exhibit LL, attached,** Additional pages Transcript of Norbert Garland, pp. 46:16-47:22, 34:20-35:16.)

Furthermore, Norbert Garland testified that the later-discovered safety concerns were serious but were After Plaintiff resigned and had he known about them also, then he would have fired Plaintiff and asked FAA to revoke his license as A&P because he is dangerous – so they were all known to Norbert when he typed the statement but not at the time of Plaintiff's decision to resign (only the dangerous Pylon incident – **see ECF #18, Statement of Facts, ¶¶13-14 including testimony of eyewitness Tim Grevich.** For example, Plaintiff's actions violated the Boeing Manuals and safety warnings; he could have been injured, and others around him could have been injured or even killed if the panel he was trying to get back onto the pylon had flown away in the force of the jet stream and hit some other worker in the head or elsewhere). (*See* **Exhibit LL, attached,** Additional pages Transcript of Norbert Garland, pp. 108:7-109:10.)

Somehow, this to Plaintiff is pretext. To Defendant airline Kalitta Air, it was credible information that the company had to take seriously, suspending Plaintiff to determine if Plaintiff could safely perform the aircraft maintenance that is an FME's job, without being a danger to himself and to others. Kalitta Air may require as a standard for employment that an FME will not pose a "direct threat" to the health or safety of himself or others that cannot be eliminated by reasonable accommodation. *See* 42 USC § 12113(b); 42 USC § 12111(3); 29 CFR § 1630.2(r). Whether Plaintiff had an excuse or the circumstances were/were not quite what was reported, Kalitta Air absolutely had to take action to prevent a potentially dangerous FME from working on its airplanes until the fats could be determined. Plaintiff's suspension for unsafe behavior is the same treatment as the discharge of FME Reggie Russell, discussed above in Section V. However, Plaintiff resigned and therefore no investigation was completed into the incident(s).

As detailed extensively in Defendant's Motion, Kalitta Air had numerous concerns regarding incorrect procedures, Plaintiff's judgment, and safety—items ranging from repairing a part on the wrong side of the aircraft—something very basic and simple but showing lack of organization, focus, and adherence to procedures; to coworker report of very unsafe behavior standing in jet engine wake. Defendant will not here repeat the testimony and documentary proof to refute the inaccuracies in Plaintiff's Response Brief, other than to remind the Court of the testimony and documents detailed in Defendant's Motion and that Kalitta Air had a legitimate safety concern warranting suspension of an FME before he could do further work on Defendant's aircraft. **See ECF #18, Statement of Facts, ¶¶9-19.**

## CONCLUSION

WHEREFORE, Defendant respectfully requests that this Court Grant Defendant's Motion for Summary Judgment for the reasons set forth above.

                                                Respectfully submitted,

                                                s/George W. Kelsey
                                                Kelsey Law Group, P.C.
                                                Attorney for Plaintiffs
                                                2395 South Huron Parkway, Suite 200
                                                Ann Arbor, MI 48104
                                                (743) 973-1222
                                                gkelsey@kelseylaw.com
Dated: June 27, 2013                             P15855

g:\k\kalitta\air\m\moran, bryce-u.s. district court lawsuit-2011\pleadings\reply to summary judgment v2 062713-klg.doc

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 27, 2013, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Donald J. Gasiorek of Gasiorek, Morgan, Greco & McCauley, P.C. – dgasiorek@gmgpc.com, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participant: No non-ECF participants.

        /s/ Karen L. Girard (P61631)
        KELSEY LAW GROUP, P.C.
        Attorneys for Defendant
        2395 S. Huron Parkway, Suite 200
        Ann Arbor, Michigan 48104
        (734) 973-1222
        kgirard@kelseylaw.com

*g:\k\kalitta\air\m\moran, bryce-u.s. district court lawsuit-2011\pleadings\reply to summary judgment v2 062713-klg.doc*